# IN THE COURT OF APPEALS OF IOWA

No. 23-0145
Filed October 11, 2023

**IN THE INTEREST OF Z.T.,**
**Minor Child,**

**J.V., Mother,**
    Petitioner-Appellee,

**N.T., Father,**
    Respondent-Appellant.
_____

    Appeal from the Iowa District Court for Osceola County, Shawna L. Ditsworth, District Associate Judge.

    A father appeals the termination of his parental rights under Iowa Code chapter 600A. **AFFIRMED.**

    Jennifer Bennett Finn of Pelzer Law Firm, LLC, Estherville, for appellant.

    Michael L. Sandy and Alexandria Celli Smith of Sandy Law Firm, P.C., Spirit Lake, for appellee.

    Abby Lynn Goettsch Walleck of Maahs & Walleck, Spirit Lake, attorney and guardian ad litem for minor child.

    Considered by Tabor, P.J., Buller, J., and Danilson, S.J.*

    *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**TABOR, Presiding Judge.**

Did writing letters daily to his daughter during a second stint in prison—but not sending them to her home—constitute "regular communication" to avoid a finding of abandonment against this father under Iowa Code section 600A.8(3)(b) (2023)? The juvenile court decided it did not.

That father, Nathan, appeals the juvenile court's order terminating his parental rights to his thirteen-year-old daughter, Z.T. He argues the mother, Jade, did not offer clear and convincing evidence that he abandoned Z.T. under Iowa Code sections 600A.2(20) and 600A.8(3)(b). He also disputes the finding that he failed to support the child financially under section 600A.8(4). Finally, he argues termination of his rights was not in Z.T.'s best interests.

Like the juvenile court, we find Jade met her burden of proof on both abandonment and best interests. After our independent assessment of the record, we affirm the termination order.[1]

## I. Facts and Prior Proceedings

Nathan and Jade met when they were teenagers. Jade recalled that's when she was "introduced" to methamphetamine. They were in their early twenties when Z.T. was born. Jade later described Nathan as "physically and mentally abusive."

The couple separated in 2014 when Z.T. was four years old. For about a year after that separation, Nathan had regular visits with his daughter. But those

---

[1] We review the record de novo. *In re G.A.*, 826 N.W.2d 125, 127 (Iowa Ct. App. 2012). We defer to the juvenile court's fact findings, particularly on witness credibility, but those findings do not bind us. *In re R.K.B.,* 572 N.W.2d 600, 601 (Iowa 1998). Our primary concern is the child's best interests, though we give "due consideration" to the interests of the parent. Iowa Code § 600A.1; *G.A.*, 826 N.W.2d at 127.

interactions ended when Nathan went to prison. While incarcerated he did not have in-person contact with Z.T., but he did write her letters, which Jade found appropriate and allowed their daughter to read. Nathan served about one year in prison. His visits with Z.T. resumed upon his release in 2016. Jade recalled that she sometimes gave him rides to Z.T.'s school events.

But their geniality faded in 2019 when Nathan became less reliable and started sending hostile text messages. Jade feared that he was using drugs. That fall she obtained a civil protective order that placed Z.T., then nine years old, in her temporary custody. The order did not list Z.T. as a protected party. But Nathan did not attend the hearing to determine visitation. He later offered two reasons for his absence: "I didn't have transportation, and a bigger one being that I had warrants out at the time and I was on the run."

Nathan has not seen Z.T. since 2019. He did not initiate contact even after the protective order expired in September 2020. But he did petition for custody and visitation in December 2020. Shortly after filing that petition, he showed up unannounced at Jade's home.[2] He was then on pretrial release for a burglary charge. She called the sheriff, who advised Nathan to stay off her property. Then a few days before the March 2021 hearing scheduled on his petition, he went back to prison. As the district court noted: "The custody case remains open without any order for temporary or permanent custody or visitation."

---

[2] Nathan testified that he figured out where Jade lived by looking at a photograph that his mother had of Z.T. in the front yard, and he then "skimmed" every farmhouse in the vicinity on Google Earth to identify her location.

Like he did during his previous prison term, Nathan wrote letters to Z.T. In his words, "I wrote her every day. I would send one envelope out a week and it was full of at least seven letters." But unlike before, this time he did not mail them to Jade. Instead, he sent the letters to his own mother's address. He explained that he did not send the letters to Jade because he was afraid that "they would be destroyed." He hoped that "sometime in the future" Jade would "come around and at least contact my mom, because they had a good relationship together, and then thinking that [Z.T.] would be able to get those letters." Jade did not know the letters existed until the termination trial. Had she received them, Jade said, she would have let Z.T. decide whether to read them.

In September 2022, while Nathan was in prison, Jade petitioned to terminate his parental rights. That December, the court heard testimony from Jade, Nathan, and Nathan's mother and father.

On child support, Jade testified that Nathan was not ordered to pay support until May 2017.[3] In the first two years of court-ordered support, he fell behind, paying no support at all in 2019. Since 2020, he increased his payments to catch up on his obligation. To that end, in October 2021, while he was in prison, he paid a lump sum of $1800 to reduce his arrears. Jade believed that money came from his mother or father. But Nathan insisted it was his own money. As of the termination hearing, he was just $536 behind in his support.

---

[3] Jade testified that he did not provide any support between 2014 and 2017.

The court terminated Nathan's rights under sections 600A.8(3)(b) (abandonment) and 600A.8(4) (court-ordered support). He challenges both alternatives on appeal.

## II. Analysis

Iowa Code chapter 600A governs petitions filed by one parent to terminate the legal rights of the other parent, so-called "private" terminations. *In re B.H.A.*, 938 N.W.2d 227, 232 (2020). The petitioner, Jade, has a two-pronged burden. *See id.* First, she must prove by clear and convincing evidence that Nathan either abandoned Z.T. or failed to support her financially. *See* Iowa Code §§ 600A.8(3)(b), .8(4). Second, Jade must show termination is in Z.T.'s best interests. *See id.* § 600A.1; *B.H.A.*, 938 N.W.2d at 232. Nathan challenges her proof under both prongs.

### A. Abandonment

When a juvenile court terminates parental rights on more than one ground, if one of the grounds is established by clear and convincing evidence, we will uphold the termination. *In re B.L.A.*, 357 N.W.2d 20, 22 (Iowa 1984). We find ample evidence in the record to support termination of Nathan's parental rights for abandonment under Iowa Code section 600A.8(3)(b).

"To abandon a minor child" means the parent "rejects the duties imposed by the parent-child relationship, . . . while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child." Iowa Code § 600A.2(20).

When, as here, the child is older than six months, the legislature considers a parent to have abandoned that child

unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:

 (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.

 (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.

 (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

*Id.* § 600A.8(3)(b).

Nathan argues that the grounds for abandonment were not met because he "wrote letters almost every day to his daughter since his incarceration." He also claims that he asked his parents to send Z.T. gifts while he was in prison. He recounts that his mother sent Z.T. a card in 2021 that was "never opened or given to the child." We read his argument as contesting Jade's proof under subsection two: that he did not maintain "regular communication with the child" to demonstrate his "substantial and continuous or repeated contact."

Jade disputes his claim that the letters were "regular communication" with Z.T. She asserts: "By sending these letters to a third party as opposed to the minor's mother, not only does the chance of receipt by the minor decrease rapidly, but such correspondence is not even correspondence with the minor but rather correspondence with his own mother." She also notes Nathan's own testimony that he planned to give all of the letters to Z.T. "someday."

We find Jade's position more persuasive. Letters mailed to an intermediary—with no realistic expectation that they would be passed on to Z.T. or

Jade—do not fit the definition of "regular communication with the child" under section 600A.8(3)(b)(2). Chapter 600A does not define that phrase. But we can look to the dictionary as a source for the common meaning of those words. *State v. Damme*, 944 N.W.2d 98, 104 (Iowa 2020). In this context, communication means "a piece of conveyed information." *Communication*, Merriam-Webster.com, www.merriam-webster.com/thesaurus/communication. And regular means "appearing or occurring repeatedly from time to time." *Regular*, Merriam-Webster.com, www.merriam-webster.com/thesaurus/regular. Those definitions confirm that the information must be conveyed on a frequent basis. On top of that, the legislature included the prepositional phrase "with the child"—which rules out merely archiving the letters for later consumption.

Nathan has made, at best, a marginal effort to communicate with Z.T. during his most recent prison term. Our supreme court has said repeatedly that "[a parent] cannot use his incarceration as a justification for his lack of a relationship with the child." *B.H.A.*, 938 N.W.2d at 234. And Jade was "under no duty to ensure" that he kept in touch with Z.T. *See id.* But that is not to say that every "incarcerated parent should lose his or her parental rights because of their incarceration." *See id.* at 242 (Appel, J., dissenting). It's the added fact that Nathan was more dutiful about maintaining contact with Z.T. during an earlier stint in prison. His decision this time to stockpile letters for Z.T. did not justify preserving his parental rights. We thus affirm the abandonment finding.[4]

---

[4] Because we affirm on the abandonment ground, we need not reach his argument on the court-ordered child support. *See B.L.A.*, 357 N.W.2d at 22.

**B. Best Interests**

Nathan contends termination was not in Z.T.'s best interests because he has "always been a big part of her life." He recognizes he would have to rebuild the trust between them, but believes that he can be a positive influence down the road. He also points out that termination will deprive Z.T. of the benefits of extended family—especially her paternal grandmother.

Defending the juvenile court's ruling, Jade argues that Nathan shouldered no parental responsibility for over three years, not even the limited measures he could have taken while incarcerated.

To evaluate best interests, we use this statutory definition:

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

Iowa Code § 600A.1(2).

Nathan had no contact with Z.T. for three and one-half years—about one third of her life. Given that long absence, he has not maintained a vital place in his daughter's life.

That assessment is bolstered by the opinion of Z.T.'s guardian ad litem. At the hearing, the GAL conveyed the teenager's views:

> She expressed that her dad has been in prison more than out in the last four years and, thus, he has not been around, in which have been formative years for her and he has missed a lot and she doesn't believe he deserves to now have time with her. She is happy and comfortable in her current environment and does not want to see that

change. She expressed that she wants to have—if she wants to have a relationship with her dad, it would need to be on her own terms, based on how he behaves when he is finally out of prison.

The GAL also provided an insightful take on the issue of extended family: "While I have empathy for these grandparents and hope that Jade would work with them to have some contact, this hearing is about Nathan's rights and not the grandparents." We echo those sentiments. *See In re W.S.T.*, No. 07-1564, 2008 WL 4307986, at *2 (Iowa Ct. App. Sept. 17, 2008) ("To affirm the termination will cut the child off from the father and his extended family. Yet the father has not maintained the contact with the child he should have."). In the end, the best-interest factors in chapter 600A favor terminating Nathan's rights.

**AFFIRMED.**